**NOT FOR PUBLICATION**

CHRISTINA ENG EVINER,

                      Plaintiff,

      – against –

YOKETING ENG, et al.,

                     Defendants.

**MEMORANDUM & ORDER**

13-CV-6940-ERK

KORMAN, *J.*:

Plaintiff Christina Eng Eviner filed this action against three of her family members and several financial institutions. Second Am. Compl. at ¶¶ 2-23. Christina alleges that the defendants stole the dividends, disbursements, and other income that a portfolio of stocks produced between 1993 and 2012. *Id.* at ¶¶ 27-39. There are currently five motions for summary judgment pending.

## BACKGROUND

Herbert Eng died in 1993, leaving five children, Christina, Anna, Yoketing, Terrence, and Donna. *See* Fredrick Biehl Decl. Ex. 8, 1. Herbert owned two real properties at the time of his death. *See id.* at Ex. 2, 3. "The House" is located in the Brighton Beach area of Brooklyn, and contains two residential units. "The Store" is located in the Bensonhurst area of Brooklyn, and contains one commercial and one residential unit. Herbert's will named Anna as executrix. *Id.* at Ex. 8, 2. The will further bequeathed and devised to Anna the bulk of Herbert's probate estate, including the two real properties. *Id.*

Herbert also owned non-probate assets at death—namely, a portfolio of stocks then valued at approximately $200,000, owned in joint tenancy with Christina. *Id.* at Ex. 2, 5. Under

New York property law, this portfolio transferred fully to Christina upon Herbert's death. *See In re Kane's Estate*, 246 N.Y. 498, 502 (1927). Nevertheless, Christina claims that she was unaware of her interest in the stock portfolio following Herbert's death. She further claims that her sister, Anna, and brother, Yoketing, actively concealed the portfolio. Mem. Supp. Pl.'s Mot. Summ. J. at 4. Indeed, Christina alleges that she became aware of the portfolio only when a "property reporting company" contacted her in 2012. *Id.* After discovering the portfolio, Christina confronted Yoketing, who eventually delivered the stocks to her. *See* Steven Lewbel Supp. Decl. Ex. 3, 90-93. Christina now maintains control of the portfolio, apparently valued today at approximately $1,000,000. Mem. Opp'n Pl.'s Mot. Supp. J. at 10.

Christina filed this action against her sister Anna; her brother Yoketing; Yoketing's wife, Trinh; and several financial institutions. Second Am. Compl. at ¶¶ 2-23. She seeks approximately $285,000 in dividends and other income that the stock portfolio produced between 1993 and 2012 (the "portfolio income"), plus consequential damages of approximately $500,000 as well as attorney's fees, triple damages, and punitive damages. Fredrick Biehl Decl. Ex. 13, 5.

Yoketing and Trinh admit that between 1993 and 2012, they received Christina's portfolio income in the form of checks made payable to Herbert and Christina. Supp. Steven Lewbel Decl. Ex. 3, 83-85. Trinh (a certified public accountant) testified in deposition that her practice was to open portfolio income checks that had been mailed to Herbert and Christina. Fredrick Biehl Decl. Ex. 3, 50. Trinh would then sign for Herbert and Christina on the endorsement line of the checks and deposit the funds into various accounts (often Trinh's personal accounts; sometimes a supposedly "segregated" account). *See id.* at 33, 189, 195.

In defending this practice, Trinh testified that Christina, Yoketing, and Anna agreed in 1993 to share Christina's portfolio income to pay "family" expenses, e.g. expenses related to the House and the Store. *See id.* at Ex. 4, 9. Part of this oral agreement was an understanding that, for efficiency purposes, Trinh would conduct all financial transactions regarding the portfolio income. *Id.* Yoketing corroborates Trinh's story by testifying that Christina had a practice of sometimes delivering portfolio income checks directly to Yoketing for him and Trinh to "handle." Supp. Steven Lewbel Decl. Ex. 3, 82-83. Trinh concedes that she never spoke directly with Christina about the purported agreement and that, but for Yoketing's word, she has no basis for believing the agreement exists. Fredrick Biehl Decl. Ex. 3, 49. Both Christina and Anna adamantly deny the existence of any agreement. Indeed, Anna (who may or may not be blind according to the record) claims complete ignorance as to Trinh and Yoketing's practice of depositing Christina's checks. Mem. Supp. Anna's Mot. Summ. J. at 5-6. Nevertheless, Christina does not believe Anna, thinking that, at a minimum, Anna had knowledge as to Yoketing and Trinh's fraud. Second Am. Compl. at ¶ 112.

Trinh's record-keeping between 1993 and 2012 was deplorable. Trinh testified that she received pre-printed tax forms bearing Herbert and Christina's names from the various companies that provided portfolio income. Trinh admits that she did "nothing" with the forms. Fredrick Biehl Decl. Ex. 3, 196. Trinh has located only a small number of records regarding the portfolio income that she received between 1993 and 2012. *See id.* at 30-33, 229-30. Nor can Trinh locate many of the documents detailing what expenses she supposedly paid regarding the "family" properties. *Id.* Further exacerbating matters, Trinh used multiple bank accounts between 1993 and 2012, apparently leaving one bank altogether because it would no longer accept checks "doubly endorsed" from Herbert and Christina. *Id.* at 19-22, 46, 233-35. Trinh

admits to comingling portfolio income with her personal funds and agrees that the portfolio income she received between 1993 and 2012 was greater than the amount she paid out on family property. *Id.* at 247.

Indeed, Trinh concedes that she paid out no expenses on family properties after 2006. *Id.* at 47. It is thus Trinh's use of portfolio income between 2006 and 2012 that presents the most apparent cause for concern. To fully appreciate this issue, it is necessary to understand the history surrounding the House and the Store. Following Anna's inheritance of these two properties in 1993, Christina, Anna, Yoketing and Trinh all lived at the House together. Christina then moved out after marrying, sometime around 2000. *See* Steven Lebwel Decl. Ex. F, 131. Next, Yoketing and Trinh moved out in 2006 after purchasing their own home, leaving only Anna, who apparently still resides there. Supp. Steven Lewbel Decl. Ex. 3, 65. As for the Store, Anna deeded it to Yoketing sometime around 1998 in exchange for no consideration. *See id.* at 108.

In order to comply with Yoketing, Christina, and Anna's supposed agreement, Trinh claims that from 1993 to 2012, she used portfolio income to pay expenses related to "family" property only, not personal property owned by her or Yoketing. Accordingly, Trinh claims that she never used portfolio income for expenses related to the Store after 1998 (the year in which Anna deeded the Store to Yoketing). *Id.* at 45. The only family property available after 1998, therefore, was the House. But, as stated earlier, the record reveals that Trinh paid absolutely no expenses related to the House once she and Yoketing moved out in 2006. Fredrick Biehl Decl. Ex. 3, 228. The question is thus what Trinh did for the six year period between 2006 and 2012, during which she received portfolio income but paid no expenses related to any family property.

In attempting to fill this gap, Trinh admits that she deposited portfolio income into her personal accounts between 2006 and 2012, but claims that she did so to save funds in the event that Christina and Yoketing's schizophrenic brother, Terrence, should need support in the future. *Id.* at 47. That is, Trinh claims that saving money for Terrence was also part of the purported agreement that Christina, Yoketing, and Anna made in 1993. *Id.* at 47-48. But even assuming that there was such an agreement, it appears that Trinh has saved no funds for Terrence, or, at a minimum, has maintained such poor records as to make it unclear what funds she saved. Indeed, Trinh concedes that between 2006 and 2012, she deposited at least $80,000 of portfolio income into her personal Citibank accounts. *See id.* Ex. 14, 228. Yet around the time that Christina initiated this action, those accounts held approximately $2,000—suggesting that Trinh spent $78,000 on personal expenses. *Id.* at Ex. 3, 246. Trinh argues that she has funds in other personal accounts to "cover" the $78,000, but she points to no account in particular. *Id.* at 242, 247. Moreover, Trinh could only surmise that she received $80,000 of portfolio income between 2006 and 2012 because she has never conducted a thorough accounting. *Id.* at 65. And it is clear that she never held funds for Terrence in a special or supplemental needs trust, nor did she implement any real investment strategy. In fact, Trinh readily admits that she took as her own personal income much of whatever interest was earned on the funds she supposedly held for Terrence. *Id.* at 293-94. Terrence has never asked Trinh for funds, nor has Trinh provided any. *See id.* at 165. Trinh has not even spoken with Terrence since 2003. *Id.*

Pertinent to this dispute are four voicemails that Yoketing and Trinh left on Christina's phone following their receipt of a demand letter that Christina's attorney sent in 2012. One voicemail from Yoketing states that he is "sorry . . . I can't eat and I can't sleep either . . . I made a mistake please let's just get together and talk OK. I am so sorry. I didn't know about your

financial situation. If I did I would have made it right." Mem. Supp. Pl.'s Mot. Summ. J. at 8-9. In another voicemail, Yoketing states, "Again I am sorry . . . Anna had nothing to do with this. She just left it to me and I did what I did." *Id.* When confronted with these voicemails at his deposition, Yoketing testified that he was only trying to "soothe" Christina, and that in reality he had committed no "mistake," nor did he actually need to "make right" on anything. Supp. Steven Lewbel Decl. Ex. 3, 101, 105.

The record reveals many instances of unscrupulous behavior by Yoketing and Trinh. For example, Yoketing testified that he has two social security numbers. He apparently obtained the second social security number by submitting a pseudonym to the government in an effort to obtain a student loan to which he was otherwise not entitled. *Id.* at 13-16. Yoketing and Trinh own at least five properties, including a brownstone in Park Slope, a large apartment complex in Prospect Heights, a brownstone in Bedford-Stuyvesant, a residential building in Bensonhust, and a farm in Delaware. *Id.* at 33-34. While law requires that Yoketing and Trinh hold their tenants' rental deposits in escrow accounts, the record reveals that Yoketing and Trinh do no such thing, instead treating tenant deposits as personal funds. Ltr. to Judge Orenstein, Oct. 9, 2014, ECF No. 192, 3. The record further indicates that Yoketing and Trinh have received rental income in the past for which they have not paid taxes or otherwise reported. Fredrick Biehl Decl. Ex. 3, 97-99.

As a general matter, property tends to be communal within the Eng family unless owned by Yoketing or Trinh. Whereas Anna treated rental income from the Store as communal family income while she owned it, as soon as Yoketing took title all matters regarding the Store were personal to Yoketing and Trinh, including all proceeds resulting from the eventual sale of that property. *See id.* at 230. And of course, Christina's portfolio income was always communal

from Yoketing and Trinh's perspective. Here, it is noteworthy that Trinh used a substantial portion of Christina's portfolio income to pay the mortgage and expenses on the Store from 1993 through 1998; but upon Yoketing and Trinh's eventual sale of the Store, they offered Christina no portion of the proceeds. *Id.* Similarly, neither Yoketing nor Trinh paid rent to Anna while they lived in the House from 1993 to 2006, despite Anna's sole ownership. *Id.* at 96. Yet Christina paid rent (albeit a nominal amount of $100 per month) to *Yoketing* while she lived in the House. *Id.* at 97-98. When asked in deposition to explain these and other instances of unequal treatment, Yoketing frequently had no response. *See, e.g.*, Supp. Steven Lewbel Decl. Ex. 3, 66-67. In some instances, Yoketing attempted to justify the disparate treatment by noting that he has children, whereas other members of the Eng family were not carrying on Herbert's lineage. Fredrick Biehl Decl. Ex. 3, 36. Accordingly, Herbert would have wanted Yoketing to have a greater share of family assets. This of course ignores that the state of Herbert's affairs at his death suggest otherwise, not to mention that Christina also has children. Steven Lewbel Decl. Ex. F, 19.

## PROCEDURAL HISTORY

Christina, a New Jersey resident, filed this diversity action in April 2012, in the United States District Court for the District of New Jersey. ECF No. 1, 1. There is complete diversity among the parties. ECF No. 158, 2. Her second amended complaint ("SAC") asserts causes of action against Anna, Yoketing, and Trinh for fraud, constructive fraud, conspiracy to commit fraud, conversion, aiding and abetting fraud, violations of the New Jersey RICO Act, unjust enrichment, an accounting, imposition of a constructive trust, and breach of fiduciary duty. *See generally* ECF No. 77. The SAC also asserts causes of action against several banks that negotiated and cashed the portfolio income checks between 1993 and 2012—Citibank, Bank of

New York Mellon, and Bank of America (collectively, the "Bank defendants"). *Id.* at 24-25. Against the Bank defendants, Christina alleges conversion as well as violations of New Jersey's Uniform Commercial Code. *Id.* The Bank defendants assert cross-claims against Anna, Yoketing, and Trinh, including claims for indemnification and contribution, as well as claims against Yoketing and Trinh for breach of the transfer and presentment warranties under New York's Uniform Commercial Code. Mem. Supp. Bank Defs.' Mot. Summ. J. at 4-5. While Christina initially named as defendants the various companies in which her portfolio holds shares, she has since voluntarily dismissed those parties. ECF No. 158, 2.

In December 2013, the case was transferred to the Eastern District of New York pursuant to 28 U.S.C. § 1406(a) because venue was improper. *Id.* at 1. In transferring the case, the district judge in New Jersey wrote in pertinent part:

> The allegations of the Complaint demonstrate that all of the "substantial" events underlying [Christina's] claims occurred in New York. Anna, [Yoketing], and Trinh Eng reside in Brooklyn, New York. At the time of Herbert Eng's death, the plaintiff, [Christina], resided in New York as well. Herbert's will was probated in Brooklyn, New York, and the estate tax return was filed by Anna in New York State. Any distributions from the stocks as issue were allegedly diverted and received by [Yoketing] and Trinh in New York . . . . In the SAC and her Opposition Brief, [Christina] does not so much as allege that any of this offending conduct occurred in New Jersey.
>
> *****
>
> The only alleged acts occurring in New Jersey are phone calls and visits from the Eng Defendants to Eviner at her New Jersey home . . . [none of which involved] Herbert's estate.

Order, Dec. 6, 2013, ECF. No. 158, at 6–7.

On April 21, 2015, Magistrate Judge Orenstein imposed what he referred to as a "constructive trust" on certain assets held by Yoketing and Trinh. Specifically, he ordered that

$1,800,000 in funds be held in a segregated account at Valley National Bank, and that the funds may be disbursed only by court order. ECF No. 196-1, 2. Judge Orenstein's order also prohibits the sale, mortgage, or encumbrance of Yoketing and Trinh's Brooklyn properties and requires that all rental income from those properties be deposited into the segregated account. *Id.* at 3. Also on April 21, 2015, Judge Orenstein denied Yoketing and Trinh's motion to vacate or modify the "constructive trust," stating that "I conclude that [Yoketing and Trinh] have not established that they would suffer any cognizable harm from the [] constructive trust" and that they have not submitted "credible evidence" evincing a hardship, "nor have they credibly explained how they sustain their claimed personal expenses with the income and assets they have disclosed." ECF No. 191.

On May 4, 2015, Yoketing and Trinh filed Rule 72(a) objections to Judge Orenstein's imposition of the constructive trust as well as Judge Orenstein's denial of their motion to vacate or modify the constructive trust. In a five-page memorandum and order, I rejected the Rule 72(a) objections and affirmed Judge Orenstein's orders. *Eviner v. Eng*, No 13-cv-6940, 2015 WL 4461022 (E.D.N.Y. July 20, 2015). Indeed, while Judge Orenstein had mislabeled his order as imposing a "constructive trust," his actions were proper in substance under Fed. R. Civ. P. 64 and N.Y. C.P.L.R. § 6201 as a "prejudgment attachment." *Id.* at *3-4.

There are currently five motions pending: (1) Christina seeks summary judgment against Yoketing and Trinh on four of the counts set out in the SAC; (2) Yoketing and Trinh move for summary judgment against Christina on several of the claims in the SAC, and against the Bank defendants regarding the Bank defendants' claims for indemnification and contribution; (3) in a separate motion, Yoketing and Trinh seek to "exclude" Christina's damages experts "from testifying at trial"; (4) Anna seeks summary judgment against Christina, stating that there is no

evidence that Anna engaged in any wrongdoing; and (5) the Bank defendants seek summary judgment against Anna, Yoketing, and Trinh, arguing that the Bank defendants are entitled to indemnification and contribution in the event that the Bank defendants are found liable.

## I.   SUMMARY JUDGMENT STANDARD & CREDIBILITY DETERMINATIONS

Summary judgment is warranted where the movant cites to materials in the record showing that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. When considering a motion for summary judgment, a court must construe the evidence in the light most favorable to the nonmoving party, drawing all inferences in that party's favor. *Niagara Mohawk Power Corp. v. Jones Chem., Inc.,* 315 F.3d 171, 175 (2d Cir. 2003). "[T]he judge must ask . . . not whether . . . the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for [one party or the other] on the evidence presented." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir.1996).

## II.   CHRISTINA'S MOTION FOR SUMMARY JUDGMENT AGAINST YOKETING AND TRINH

Christina moves for summary judgment against Yoketing and Trinh on counts I, V, VII, and X as set out in her SAC—conversion, fraudulent misrepresentation, unjust enrichment, and constructive trust. In their briefs, the parties focus almost exclusively on the question whether Christina agreed in 1993 to share her portfolio income. The parties act as if liability turns on that question alone. That is, they never address the more nuanced question of what liability Yoketing and Trinh might face even assuming that Christina agreed in 1993 to share her portfolio income.

I discuss these two distinct questions in separate subsections below, ultimately denying Christina's motion for summary judgment without prejudice so that she may renew her motion and address the unbriefed issues I set out below. Before doing so, I discuss one evidentiary issue regarding certain voicemails.

### A. The Voicemails

In support of her motion, Christina submits the transcripts of four voicemails left on her phone, three from Yoketing and one from Trinh. Voicemail Tr., Mem. Supp. Pl.'s Mot. Summ. J. at 8-9. Christina claims that each voicemail constitutes an admission of liability, proving that Christina never agreed to share her portfolio income. *Id.* Yoketing and Trinh argue that the voicemails constitute inadmissible evidence related to a settlement negotiation and are therefore impermissible for consideration on summary judgment. Mem. Opp'n Pl.'s Mot. Summ. J. at 11.

Federal Rule of Civil Procedure 56(c)(2) provides that "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." A district judge has broad discretion in choosing whether to admit evidence. *Id.* at 65. Under Federal Rule of Evidence 408(a)(2), "conduct or a statement made during compromise negotiations about [a] claim" is "not admissible . . . to prove or disprove the validity . . . of [the] disputed claim or to impeach by a prior inconsistent statement or a contradiction." *See also* Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 408.03 (2d ed. 2009) ("Rule 408 codifies the long-standing axiom in federal courts that compromises proposed . . . are not evidence of an admission . . . .").

It is sometimes difficult to discern whether conduct or a statement is made "in compromising or attempting to compromise a claim." *Pierce v. F.R. Tripler & Co.*, 955 F.2d 820, 827 (2d Cir. 1992). The Second Circuit has held that "both the timing of the [conduct or

statement] and the existence of a disputed claim are relevant to the determination." *Id.* The underlying purposes of Rule 408 are also relevant: (1) to exclude "evidence [that] is irrelevant, since the [statement or conduct] may be motivated by a desire for peace rather than from any concession of weakness of position"; and (2) to promote "the public policy favoring the compromise and settlement of disputes." *See id.*; *see also* Fed. R. Evid. 408 Advisory Committee Notes (1972 Amends.). While the Second Circuit delineates no precise test, it stated in *Pierce v. F.R. Tripler & Co.* that "where a party is represented by counsel, threatens litigation and has initiated the first administrative steps in that litigation, any offer made between attorneys will be presumed to be an offer within the scope of Rule 408." 955 F.2d at 827. Providing an even broader interpretation, several district judges hold that "[a]ll that is needed for Rule 408 to apply is an actual dispute, or at least an apparent difference of opinion between the parties as to the validity of a claim." *See Alpex Computer Corp. v. Nintendo Co.*, 770 F. Supp. 161, 163 (S.D.N.Y. 1991) (collecting authorities). As a general matter, courts focus on whether the pertinent statement was made in attempting to persuade the plaintiff into "abandon[ing] or modify[ing]" her suit. *See Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 909 (2d Cir. 1997).

While the Second Circuit's *Pierce* decision suggests that communications between attorneys are likely to fall within Rule 408, communications between the parties themselves may also come within the scope of the Rule. As one treatise suggests:

> With respect to settlement talks among the litigants themselves, here too the exclusionary rule serves a good purpose. In some degree no doubt, lay people in the fourth century of the Republic sense that they will not be penalized in trying to settle their difficulties, even while they sense the risk in 'saying too much.' If they do not rely upon the exclusionary principle underlying Rule 408, it remains the case that reasonable behavior by litigants seeking to resolve difficulties should not be penalized by evidence offered in trial over proper objection.

Christopher B. Mueller & Laird C. Kirkpatrick, Federal Evidence, § 4:56, 117-18 (4th ed. 2013).

The evidentiary issues here are hardly developed by the parties. Indeed, Yoketing and Trinh's brief mentions Rule 408 only in passing. And Christina's brief provides no citations or legal analysis, stating only that "[Yoketing and Trinh's] voice mails do not come close to meeting Rule 408 requirements of settlement negotiations and require no further response." Pl.'s Mem. Supp. Mot. Summ. J at 14. On the contrary, the record indicates that Yoketing and Trinh left their voicemails soon after receiving a demand letter from Christina's attorney. Supp. Steven Lewbel Decl. Ex. 1. Moreover, around the time of the voicemails, Yoketing and Trinh had apparently just retained counsel, who recommended that they make an effort to settle matters directly with Christina. Voicemail Tr., Pl.'s Mem. Supp. Mot. Summ. J. at 8-9. Thus, Trinh's voicemail states, "[our attorney advised us] to try to settle [this] within the family without involving lawyers . . . I am hoping we can talk it through." *Id.* Similarly, Yoketing's first voicemail states, "let's just get together and talk OK . . . only you and I, you know, both you and I could be alone and just talk." *Id.* In his deposition, Yoketing stated that he left his three voicemails in an effort to persuade Christina to enter compromise discussions: "She was mad at me. I was trying to get her to come back and talk to me." Supp. Steven Lewbel Decl. Ex. 3, 102. The voicemails fall with the protection of Rule 408.

There is, however, one wrinkle here, which is the last of Yoketing's voicemails. There, Yoketing made what is arguably his most damaging admission: "Anna had nothing to do with this. She just left it to me and I did what I did." Voicemail Tr., Mem. Supp. Pl.'s Mot. Summ. J. at 8-9. Unlike the other voicemails discussed above, the content of this voicemail suggests that it was not made in furtherance of obtaining a compromise. Specifically, Yoketing goes on to state, "That's all. I mean, I'll try to call you now and then. It doesn't matter whether you pick up the

phone or not. I'll just say what I have to say. Even throughout the whole thing." *Id.* Under these circumstances, I construe the last voicemail as taking sole responsibility for the wrongful conduct that had taken place, as opposed to making an effort to settle the case. Indeed, by the time of Yoketing's last voicemail, there had been three previous voicemails, none of which helped to move towards a negotiation or compromise. Accordingly, this last voicemail does not fall under the protection of Rule 408.

### B. Christina's Motion for Summary Judgment

Christina claims that there is no genuine issue of material fact here because Yoketing and Trinh obviously concealed the stock portfolio's existence and because they "admit" to "forg[ing] decedent Herbert Eng and Plaintiff Christina Eng's indorsement on the checks and deposit[ing] them into [their] personal account[s]." Mem. Supp. Pl.'s Mot. Summ. J. at 5. As stated earlier, Yoketing and Trinh expressly reject the term "forgery" and argue that Christina authorized them to endorse and deposit her checks. Indeed, Yoketing and Trinh supposedly received authorization through an oral agreement occurring in 1993 between Christina, Anna, and Yoketing. Mem. Opp'n Pl.'s Mot. Summ. J. at 8. Again, Yoketing states that on numerous dates after that agreement, Christina delivered to Yoketing both unopened and opened envelopes containing portfolio checks, instructing Yoketing to "handle these." Mem. Opp'n Pl.'s Mot. Summ. J. at 6.

I deny Christina's motion for summary judgment because the existence of the 1993 agreement is a material fact over which there is a genuine dispute. It is true that even Anna denies the purported agreement, severely undermining Yoketing and Trinh's defense. Mem. Supp. Anna's Mot. Summ J. at 5. Even more damaging is Yoketing admission that "Anna had nothing to do with this. She just left it to me and I did what I did." Voicemail Tr., Mem. Supp.

Pl.'s Mot. Summ. J. at 8-9. Nevertheless, a reasonable jury could return a verdict against Christina. Indeed, Yoketing and Trinh emphasize the fact that Christina lived together with Yoketing, Trinh, and Anna at the House for approximately seven years following Herbert's death. *See* Steven Lebwel Decl. Ex F., 131. Moreover, during that time period, the companies in which Christina's portfolio held stock all mailed checks to the House. Mem. Opp'n Pl.'s Mot. Summ. J. at 7. While Christina claims total ignorance as to the existence of her stock portfolio prior to 2012, Yoketing and Trinh argue that Christina would have noticed one of the many checks or other financial documents bearing her name. *See id.* at 89-90. Thus, Yoketing and Trinh argue that it is unlikely that Christina never retrieved the mail while living at the House. *Id.* at 8.

Yoketing and Trinh's general theory of the case rests on the fact that Herbert's estate was divided disproportionately among his children such that Anna and Christina received much of Herbert's assets, to the exclusion of Herbert's other children. *See, e.g.*, Fredrick Biehl Decl. Ex. 8 (Herbert's last will and testament). They argue that the children could therefore reasonably decide among themselves to share Herbert's assets. *See* Mem. Opp'n Mot. Summ. J. at 6-8; Steven Lebwel Decl. Ex. F., 45. Specifically, they argue that the House incurred numerous expenses, including maintenance, taxes, utilities, insurance, etc. Yoketing and Trinh argue that Christina permitted use of her portfolio income to cover these expenses, and that without Christina's portfolio income, meeting these obligations would have been difficult if not impossible. Mem. Opp'n Pl.'s Mot. Summ. J. at 6. They also argue that Christina lived in the House from 1993 to 2000, during which time she paid either no rent or a nominal rent of $100. *Id.* at 8.

Christina testified at her deposition that Herbert frequently instructed her to write checks to various entities using his checking account. *See* Steven Lebwel Decl. Ex F., 103-04. This sometimes included an instruction that Christina actually sign Herbert's name. *Id.* In fact, Christina often wrote the checks that Herbert used to purchase stocks, some of which may be the very stocks underlying this action. *Id.* Yoketing and Trinh emphasize these facts to bolster their argument that Herbert regularly explained his various financial arrangements to his children and that Christina always knew about her portfolio of stock owned in joint tenancy with Herbert. Mem. Opp'n Pl.'s Mot. Summ. J. at 5.

Under all of these circumstances and conflicting allegations, I conclude there is a triable issue of fact as to whether Christina agreed in 1993 to share her portfolio income with Yoketing and Trinh, and I therefore cannot grant summary judgment for Christina on her claims of conversion, fraudulent misrepresentation, unjust enrichment, and constructive trust as set out in her motion for summary judgment. Nevertheless, even if Christina entered into such an agreement in 1993, she may be entitled to partial summary judgment on the record here regarding the losses she incurred from 2006 to 2012 for the reasons that I discuss below.

### C. *Christina's Entitlement to Partial Summary Judgment*

The undisputed evidence suggests that, even assuming that Christina agreed in 1993 to share her portfolio income, a de facto trust may have been created. Under New York law, a party creates a trust where there is (1) a designated beneficiary; (2) a designated trustee; (3) a fund or other property sufficiently designated or identified to enable title of the property to pass to the trustee; and (4) actual delivery of the fund or property, with the intention of vesting legal title in the trustee. *In re Doman*, 68 A.D.3d 862, 863 (N.Y. App. Div. 2d Dep't 2009) (citing *Brown v. Spohr*, 180 N.Y. 201 (1904)). In New York, "a trust in personal property can be

created or proved by parol, and no requirement exists that particular words be used." *Elyachar v. Gerel Corp.*, 583 F. Supp. 907, 923 (S.D.N.Y. 1984) (collecting cases). Indeed, "[t]he law will delineate a trust where, in view of a sufficiently manifested purpose or intent, that is the appropriate instrumentality, even though its creator calls it something else, or doesn't call it anything." *Id.*

Yoketing and Trinh contend that Christina shared portfolio income and agreed that Trinh should maintain and use the funds to pay family expenses, including property expenses as well as hypothetical expenses related to their disabled family member, Terrence. Mem. Opp'n Pl.'s Mot. Summ. J. at 6-7. Thus, under Yoketing and Trinh's version of the facts, Christina created a trust: (1) the beneficiaries are members of the Eng family, such as Terrence, as well as those who might use the family properties; (2) Trinh is the trustee; (3) the portfolio income is the trust property; and (4) physical delivery of the income was accomplished via checks sent in the mail, or via Christina directly delivering those checks to Yoketing so that he could pass them to Trinh. *See Starr Int'l Co. v. Am. Int'l Grp., Inc.*, 648 F. Supp. 2d 546, 559 (S.D.N.Y. 2009) (collecting cases and stating that "a trust may emerge by implication from the acts or words of the person creating it").

As trustee, Trinh incurred certain duties that she breached and for which she might be liable on the record here. For example, Trinh owed the trust beneficiaries a duty of loyalty as well as a duty to employ diligence and prudence in the management of trust assets. This included, at a bare minimum, the duty to segregate trust property. *See* Restatement (Second) of Trusts § 179. Indeed, comingling of trust funds with personal funds is permissible only in the rarest of circumstances not applicable here. Even when courts permit comingling, they require that trustees nevertheless earmark trust assets so that they can be traced. *In re Goldstick*, 177

A.D.2d 225, 236 (N.Y. App. Div. 1st Dep't 1992). Trinh (again, a certified public accountant) readily admits to comingling the portfolio income that she received between 2006 and 2012 with her personal income. Fredrick Biehl Decl. Ex. 3, 247. She further admits to spending approximately $80,000 of portfolio income on personal expenses during that 2006 to 2012 period. *Id.* at Ex. 14. It appears that Trinh is liable to the trust for that $80,000 amount, if nothing else. She is also arguably liable for any additional amounts that the trust stood to gain had Trinh prudently invested the $80,000. *See In re HSBA Bank USA, N.A.*, 98 A.D.3d 300, 310 (N.Y. App. Div. 4th Dep't 2012) (explaining the "prudent investor rule").

Thus, even assuming an outcome least favorable to Christina, summary judgment against Trinh may be available on the record here. Nevertheless, summary judgment is improper at this time because Christina did not brief the issues that I outline above related to a de facto trust or Trinh's duties as de facto trustee, nor has Trinh had an opportunity to respond. I thus deny Christina's motion without prejudice to renew. Moreover, although the time for discovery has ended, there is currently a large gap in the record that Christina may wish to fill upon submitting a renewed motion for summary judgment. Specifically, it appears that Trinh has yet to produce a thorough accounting of all the expenses she paid using Christina's portfolio income beginning from Herbert's death to the present. Such an accounting is relevant to a renewed motion and would ideally include a detail of all portfolio income received; all "family expenses" paid, including the dates of payments, applicable receipts, and a description of the expense; the current net portfolio income balance—that is, total portfolio income received minus total expenses paid; and the current location or status of all net portfolio income, including the names and locations of all financial accounts containing these funds, as well as a description of the accounts (e.g., savings account with interest bearing at 1%). *See Adam v. Cutner & Rathkopf*, 238 A.D.2d 234,

242 (N.Y. App. Div. 1st Dep't 1997) ("The right to an accounting is premised upon the existence of a confidential or fiduciary relationship and a breach of the duty imposed by that relationship respecting property in which the party seeking the accounting has an interest."); *In re Application for a Judicial Settlement of Account of Beiny*, 2003 WL 21729779, at *4 (N.Y. Sur. Ct. 2003) (collecting cases and stating that trustees have burden of proving accuracy of accounting and the failure to support the accounting results in "broad discretion being vested in the court to reach an equitable result"); *Simonds v. Simonds*, 45 N.Y.S.2d 233, 243 (1978) (it is "long established in Anglo-American law and in this State and especially relevant when family transactions are involved" that "[a] court of equity in decreeing a constructive trust is bound by no unyielding formula").

### III. YOKETING AND TRINH'S MOTION FOR SUMMARY JUDGMENT AGAINST CHRISTINA & THE BANK DEFENDANTS

Yoketing and Trinh move for summary judgment on Christina's claims of racketeering activity, conversion, fraud, breach of fiduciary duty, aiding and abetting fraud, and unjust enrichment. Yoketing and Trinh also move to strike Christina's demand for punitive damages and attorney's fees. Lastly, Yoketing and Trinh move for summary judgment on the Bank defendants' cross-claims for indemnification and contribution.

#### A. Racketeering Activity

Christina's SAC alleges a cause of action against Yoketing and Trinh under New Jersey's RICO Act. *See* N.J. Stat. Ann. § 2C:41-4. New York's RICO statute does not "contain a provision permitting a private civil cause of action." *Simpson Elec. Corp. v. Leucadia, Inc.*, 515 N.Y.S.2d 794, 807 (N.Y. App. Div. 2d Dep't 1987) (Spatt, *J.*, dissenting). Unlike New Jersey's RICO Act, the New York statute is "essentially a criminal statute with civil sanctions that can only be enforced by the district attorney." *Id.* Even where the district attorney seeks such

sanctions, he can only do so after a criminal conviction.  N.Y. Penal Law. §§ 460.50, 460.60.

Thus, application of "the New York RICO statute would effectively dispose of Plaintiff's RICO

claim because a private cause of action is not recognized."  *See Prudential Ins. Co. of Am. v.*

*Goldman, Sachs & Co.*, No. 12-cv-6590, 2013 WL 1431680, at *6 (D. N.J. Apr. 9, 2013); *see*

*also* Steven L. Kessler, *And a Little Child Shall Lead Them: New York's Organized Crime*

*Control Act of 1986*, 64 St. John's L. Rev. 797, 800 (1990) (collecting sources).

Nevertheless, before undertaking a choice of law analysis, there is a threshold question

that must be addressed.  Specifically, whether New Jersey's RICO Act was intended, or can be

read, to apply extraterritorially under the circumstances here to an enterprise that operated

outside of the State of New Jersey.  While the New Jersey RICO Act does not expressly address

the issue of whether it applies extraterritorially, there are two considerations that lead to the

conclusion that it does not.  First, although it provides a civil remedy, the Act is a criminal

statute.  Such statutes, as a general rule, do not apply to conduct occurring wholly in other states.

*State v. Sumulikoski*, 221 N.J. 93, 100 (2015); *State v. Carter*, 27 N.J.L. 449, 500-02 (1859); *see*

*also* N.J.S.A. § 2C:1–3.  Second, separate and apart from the general statutory restrictions on the

exercise of jurisdiction over criminal acts committed outside of New Jersey, see N.J.S.A. §

2C:1–3, we know from the "declaration of policy and legislative findings," found in the text of

New Jersey's RICO Act, that the legislature focused on criminal enterprises operating within

New Jersey.  Thus, N.J. Stat. Ann. § 2C:41-1.1(a) recognizes "that the existence of organized

crime and organized crime type activities presents a serious threat to the political, social and

economic institutions *of this State*."  (emphasis added).  Similarly, "organized crime and similar

activities *in this State* are still a highly sophisticated, diversified and widespread activity that

annually drains millions of dollars from *this State's economy*."  *Id.* at 1.1(b) (emphasis added).

Moreover, the legislature concluded that "effective criminal and civil sanctions are needed to prevent, disrupt and eliminate the infiltration of organized crime type activities which are substantial in nature into the legitimate trade or commerce *of this State*." *Id.* at 1.1(c) (emphasis added). Indeed, a critical element for a New Jersey RICO violation is that the "defendant was employed by or associated with a racketeering enterprise which engaged in trade or commerce in New Jersey or affected trade or commerce in New Jersey." *State v. Casilla*, 829 A.2d 1095, 1101–02 (N.J. App. Div. 2003). These two considerations persuade me that the New Jersey legislature did not intend for the Act to apply here because Yoketing and Trinh did not conduct any portion of their alleged enterprise in New Jersey. Indeed, it was precisely because all of the relevant conduct took place in New York that venue in this case was found to be improper in the District of New Jersey. Again, as the district judge there observed when transferring the case for improper venue:

> The allegations of the Complaint demonstrate that all of the "substantial" events underlying [Christina's] claims occurred in New York. Anna, [Yoketing], and Trinh Eng reside in Brooklyn, New York. At the time of Herbert Eng's death, the plaintiff, [Christina], resided in New York as well. Herbert's will was probated in Brooklyn, New York, and the estate tax return was filed by Anna in New York State. Any distributions from the stocks as issue were allegedly diverted and received by [Yoketing] and Trinh in New York . . . . In the SAC and her Opposition Brief, [Christina] does not so much as allege that any of this offending conduct occurred in New Jersey.
>
> *****
>
> The only alleged acts occurring in New Jersey are phone calls and visits from the Eng Defendants to [Christina] at her New Jersey home . . . [none of which involved] Herbert's estate.

Order, Dec. 6, 2013, ECF. No. 158, at 6.

In any event, assuming New Jersey's RICO Act could be construed to apply extraterritorially, the case would present a relatively easy choice of law question.[1]  In resolving a choice of law issue, New York employs an "interest analysis," where the threshold question involves a determination as to which jurisdiction has an interest in applying its law to the litigation.  *See Padula v. Lilarn Props. Corp.*, 84 N.Y.2d 519, 521 (1994).  This analysis begins by examining the location of the contacts each jurisdiction has with the event giving rise to the cause of action.  "[T]he only facts or contacts which obtain significance in defining State interests are those which relate to the purpose of the particular law in conflict."  *Schultz v. Boy Scouts of Am.*, 65 N.Y.2d 189, 197 (1985) (citations omitted).  "Once these contacts are discovered and analyzed they will indicate (1) that there exists no true conflict of laws . . . as in most choice of law cases, or (2) that a true conflict exists, i.e., both jurisdictions have an interest in the application of their law."  *Matter of Crichton,* 20 N.Y.2d 124, 135 n.8 (1967) (Keating, J.).  Where no true conflict exists, the law of the only jurisdiction with an interest in the application of its law will be applied.  *See, e.g.*, *Tooker v. Lopez*, 301 N.Y.S.2d 519, 525 (1969) (Keating, J.)  Where a true conflict exists, New York generally resolves such a conflict by deferring to the law of the situs of the tort as a "tiebreaker."  *See O'Connor v. U.S. Fencing Ass'n*, 260 F. Supp. 2d 545, 553 (E.D.N.Y. 2003) (citing *Cooney v. Osgood Machinery, Inc.*, 81 N.Y.2d at 74).

There is arguably a true conflict here.  Because a resident of New Jersey suffered financial injury, New Jersey arguably has an interest in seeing that she is compensated for that loss.  Nevertheless, all of the relevant conduct took place in New York, and the New York

---

[1] New York's choice of law rules would govern because this case was transferred pursuant to 28 U.S.C. § 1406(a) due to improper venue in New Jersey because the allegations in Christina's complaint failed to satisfy the three criteria set out in 28 U.S.C. § 1391(b).  *See* 14D Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3827, 532 & n.23 (4th ed. 2013); *Nat'l Union Fire Ins. Co. of Pitt. Pa. v. Am. Eurocopter Corp.*, 692 F.3d 405, 408 n.3 (5th Cir. 2012) ("The choice-of-law rules of the transferee state apply if a diversity suit was transferred from a district court where venue was . . . improper.").

legislature has expressly determined that any compensation as a result of such conduct is available only if the defendants have been convicted of violating New York's RICO statute, and even then only if the district attorney pursues such compensation. New York clearly has an interest in the application of its own law. Moreover, even if there is some overlap between the conduct that would violate both New Jersey and New York law, the New York choice of law rules suggest that New York law applies under the second of the so called *Neumeier* rules, which apply to issues of loss allocation. *See Neumeier v. Kuehner*, 335 N.Y.S.2d 64, 70 (1972).[2] As the court held in *Babcock v. Jackson*, 12 N.Y.2d 473, 484 (1963), "it is appropriate to look to the law of the place of the tort so as to give effect to that jurisdiction's interest in regulating conduct within its borders, and it would be almost unthinkable to seek the applicable rule in the law of some other place."

### B. Conversion, Fraud, and Aiding and Abetting Fraud

Yoketing and Trinh move for summary judgment on Christina's claims of conversion, fraud, and aiding and abetting fraud. They argue that Christina's claims fail because Christina, Yoketing, and Anna agreed to share her portfolio income. Mem. Supp. Eng Defs.' First Mot. Summ. J. at 17-22. Other than their own depositions asserting that Christina agreed to this, Yoketing and Trinh submit virtually no evidence supporting their position. *Id.* Moreover, Christina cites aspects of the record that flatly contradict Yoketing and Trinh's assertions— namely, Christina and Anna's depositions stating that the agreement never existed as well as Yoketing's third voicemail, where he states that "Anna had nothing to do with this. She just left it to me and I did what I did." Voicemail Tr., Mem. Supp. Pl.'s Mot. Summ. J. at 8-9. I deny

---

[2] While *Neumeier* involved the issue of guest statutes, it has been held to be applicable in any context involving loss allocation rules. *Cooney v. Osgood Machinery, Inc.*, 81 N.Y.2d 66, 73 (1993).

Yoketing and Trinh's motion for summary judgment on these claims because there is a genuine dispute of material fact.

### C.  Unjust Enrichment

Yoketing and Trinh argue that Christina's claim for unjust enrichment is "impermissibly duplicative of [Christina's] other tort based claims."  Mem. Supp. Eng. Defs.' First Mot. Summ. J. at 23.  They claim that under New York law, a plaintiff cannot maintain an unjust enrichment claim where she also maintains certain tort-based claims, like fraud or conversion.  *Id.* at 24. While that may or may not be true, it is clear that where questions of fact still remain on the tort based claims, a court need not dismiss the unjust enrichment claim.  *See, e.g.*, *Chrysler Capital Corp. v. Century Power Corp.*, 778 F. Supp. 1260, 1272 (S.D.N.Y. 1991) (declining to apply the rule precluding unjust enrichment claims).  Moreover, because Christina's unjust enrichment claims arise from the same factual predicates as her other claims, it is unnecessary to explore the unjust enrichment claim at length.  If one of a number of integrally related causes of action must be tried, it makes little sense to grant a motion for summary judgment as to one or more of them, as it may prove necessary to hold yet another trial in the event that it is determined on appeal that the motion for summary judgment was improperly granted.  As observed by Judge Clark in an analogous context: "[T]here seems no question that in the long run fragmentary disposal of what is essentially one matter is unfortunate not merely for the waste of time and expense caused the parties and courts, but because of the mischance of differing dispositions of what is essentially a single controlling issue."  *Audi Vision, Inc. v. RCA Mfg. Co.*, 136 F.2d 621, 625 (2d Cir. 1943).

### D.  Breach of Fiduciary Duty

Yoketing and Trinh seek to dismiss Christina's claim for breach of fiduciary duty.  To prove breach of a fiduciary duty, a plaintiff must show that: (1) a fiduciary duty existed between

plaintiff and the defendant; (2) defendant breached; and (3) plaintiff incurred damages. *Meisel v. Grunberg*, 651 F. Supp. 2d 98, 114 (S.D.N.Y. 2009). Christina argues that although Herbert named Anna as executrix of his estate, Yoketing handled much of the estate's affairs. Accordingly, Yoketing was a de facto administrator of the estate, and he owed Christina an accompanying fiduciary duty. Second Am. Compl. at ¶ 111. Christina argues that Yoketing breached this duty when he concealed Christina's ownership of the stocks in question and when he allowed Trinh to misappropriate Christina's portfolio income. *Id.* In their motion for summary judgment, Yoketing and Trinh seem to concede that a de facto administrator would incur fiduciary responsibilities. Mem. Supp. Eng Defs.' First Mot. Summ. J. at 21. Nevertheless, they take the position that Yoketing never handled the administration of Herbert's estate. Rather, they say Anna administered the estate with the help of the family lawyer, Samuel Feldman, thus entitling Yoketing and Trinh to summary judgment. *Id.*

First, it is not immediately apparent whether, as the parties believe, a de facto administrator of an estate incurs fiduciary duties related to non-probate assets such as Christina's stocks held in joint tenancy with Herbert, all of which passed outside of probate. *See In re Del Monte*, 37 A.D.2d 827, 827 (1971). In any event, the issue is moot for purposes of Yoketing and Trinh's present motion for summary judgment. Indeed, regardless of Yoketing's involvement in the administration of Herbert's estate, Yoketing and Trinh incurred a fiduciary relationship when, under their own theory of the case, they agreed to manage Christina's portfolio income for the benefit of the Eng family. As discuss earlier, this arguably constituted the inception of a trust, for which Trinh served as trustee. *See supra* section II.C. Even if there was no trust, New York recognizes that certain informal relationships create fiduciary duties, such as where one party relies on another due to some special expertise or status held by the latter. *See Wiender v.*

*Lazard Freres*, 241 A.D.2d 114, 123 (N.Y. App. Div. 1st Dep't 1998).  Christina argues that she relied on Yoketing and Trinh as older family members to implement due care in maintaining her portfolio income for the benefit of the Eng family.  Pl.'s Mem. Opp'n Yoketing & Trinh Mot. Summ. J. at 24.  This reliance, moreover, was especially reasonable where Trinh is expertised in accounting and financial matters.  *See Braddock v. Braddock*, 60 A.D.3d 84, 89 (N.Y. App. Div. 1st Dep't 2009) ("Family members stand in a fiduciary relationship toward one another in a co-owned business venture.").  Yoketing and Trinh are not entitled to summary judgment on the ground that they incurred no fiduciary duties.  Their motion is denied.

### E.  Punitive Damages

Yoketing and Trinh move on summary judgment to strike all of Christina's claims for punitive damages and attorney's fees, arguing that any fraud they committed was not "aimed at the public," as they claim is required under New York law.  *See Walker v. Sheldon*, 10 N.Y.2d 401, 405 (1961).  I deny the motion without prejudice and with leave to renew because there is not yet a liability finding.  *See* Fed. R. Civ. P. 42(b).

### F.  Bank Defendants' Claims

Yoketing and Trinh move for summary judgment on the Bank defendants' cross-claims for indemnification and contribution.  Reply Mem. Supp. Eng Defs. First Mot. Summ. J. at 2.  I deny the motion because it is devoid of any analysis relating to those claims.  In fact, other than in a preliminary statement, the motion does not even appear to mention the Bank defendants.  *See generally* Mem. Supp. Eng Defs.' First Mot. Summ. J.

## IV.  YOKETING AND TRINH'S MOTION FOR SUMMARY JUDGMENT ON THE ADMISSION OF EXPERT TESTIMONY

Yoketing and Trinh have filed a separate motion for summary judgment "to preclude plaintiff Christina Eng Eviner's ("plaintiff['s]") expert damages witnesses Cowan, Gunteski and

Company, P.A. and UNI Private Wealth Strategies, Inc. from offering any evidence or testimony on damages at the time of trial and for partial summary judgment dismissing said damages claims from the plaintiff's second amended complaint." *See generally* Mem. Supp. Eng. Defs.' Second Mot. Summ. J. In short, the motion argues that Christina is not entitled to "hypothetical damages" in the event that Yoketing or Trinh are liable. *See id.* at 12. They seek a declaration "striking all claims for damages beyond recovery of the provable amount of dividends/distributions (plus interest) minus deductions as warranted by the evidence." *Id.* at 17. I deny this motion without prejudice and with leave to renew after a liability determination. There is no liability finding as of yet, and thus no reason to examine the complex issues surrounding hypothetical or consequential damages. *See* Fed. R. Civ. P. 42(b).

## V. ANNA'S MOTION FOR SUMMARY JUDGMENT AGAINST CHRISTINA

Anna's briefing is unclear such that I cannot determine with confidence what relief she seeks on summary judgment. While Christina asserted 10 causes of action against Anna, Anna's motion does not mention any of them specifically. Instead, Anna states simply, "Ann[a] Eng is entitled to summary judgment as she is not a culpable defendant in this action and defendants [Yoketing] and Trinh acted independent of her." Mem. Supp. Anna's Summ. J. at 5. After making that bald assertion, Anna's brief then recites boilerplate language on common law fraud followed by a fact application section stating merely: "Here, defendants [Yoketing] and Trinh acted independent of Anna and the facts plaintiff alleged do not show that Anna affirmatively assisted any other defendant and allowed a breach to occur." *Id.* at 8. This fact application section contains no citation to the record, nor any analysis of the elements Christina supposedly failed to satisfy in asserting her 10 claims against Anna. Anna has not met her burden in moving for summary judgment, and on this ground alone I deny the motion.

In any event, the record indicates that there is a genuine dispute whether Anna participated in a scheme to defraud Christina. First, as executrix of Herbert's estate, Anna signed a New York State Estate Tax Return, Form ET-90. *See* Decl. of Fredrick C. Biehl, III, Ex. 2 at 1. Within the Form ET-90 was a list of stocks that Herbert owned in "joint tenancy" with "Christina Eng Daughter." *Id.* at 8. Second, Anna reaped large benefits from Trinh's use of Christina's portfolio income. Indeed, Trinh used Christina's portfolio income to pay the mortgage and other expenses on the Store from 1993 to 1998, during which time Anna owned the Store. *See* Fredrick Biehl Decl. Ex. 3, 45. Similarly, Trinh used Christina's portfolio income to pay expenses on the House from 1993 to 2006, during which time Anna owned and lived in the House. *See id.* at 47. Lastly, Yoketing, Trinh, and Christina all testified that Anna often delivered mail containing Christina's checks directly to Yoketing. *See, e.g.*, Steven Lewbel Decl. Ex. F, 228. All of this suggests that Anna has fabricated her claim of ignorance as to Yoketing and Trinh's practice of depositing Christina's income checks. Summary judgment on this record is inappropriate.

## VI.  THE BANK DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AGAINST ANNA, YOKETING, AND TRINH

The Bank defendants seek summary judgment on their cross-claims for indemnity and contribution against Anna, Yoketing, and Trinh. *See generally* Mem. Supp. Bank Defs.' Mot. Summ. J. Specifically, they seek a ruling that Anna, Yoketing, and Trinh are liable to the Bank defendants in the event the Bank defendants are found liable to Christina. *Id.* at 2-3. I deny the motion with leave to renew in the event of a liability determination against the Bank defendants.

## CONCLUSION

For the aforementioned reasons, I hereby order the following:

(1)    I deny Christina's motion for summary judgment against Yoketing and Trinh on Christina's claims for conversion, fraudulent misrepresentation, unjust enrichment, and constructive trust;

(2)    I grant Christina permission to renew her present motion to assert the arguments related to a de facto trust and Trinh's duties as de facto trustee, as I outline *supra* section II.C;

(3)    I deny Yoketing and Trinh's motion for summary judgment on Christina's claims for conversion, fraud, breach of fiduciary duty, aiding and abetting fraud, unjust enrichment, and punitive damages, as well as the Bank defendants' claims for indemnification and contribution;

(4)    I grant Yoketing and Trinh's motion to dismiss Christina's RICO claim;

(5)    I deny as premature Yoketing and Trinh's motion for summary judgment seeking to strike "expert testimony" related to "hypothetical damages";

(6)    I deny Anna's motion for summary judgment seeking dismissal from this suit; and

(7)    I deny as premature the Bank defendants' motion for indemnification and contribution.


**SO ORDERED.**

Brooklyn, New York
July 29, 2015                                            _____
                                                        Edward R. Korman
                                                        Senior United States District Judge